**E-Filed 5/13/10**

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CHARLES I. IKEKWERE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>GOVERNING BOARD OF FOOTHILL-DE ANZA COMMUNITY COLLEGE DISTRICT, DOES 1 THROUGH 25,<br><br>　　　　　Defendants. | Case Number C 08-00234 JF (PVT)<br><br>**ORDER[1] GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Doc. No. 31] |

　　Defendant Foothill DeAnza Community College District ("Defendant") moves for summary judgment as to all claims asserted by Plaintiff Charles Ikekwere ("Ikekwere"). The Court has considered the moving and opposing papers as well as the oral arguments presented at the hearing on May 7, 2010. For the reasons discussed below, the motion will be granted.

### I. FACTUAL AND PROCEDURAL BACKGROUND

　　In January 2004, Ikekwere began taking courses at Foothill DeAnza Community College ("Foothill") in hopes of being admitted to Foothill's Respiratory Therapy Program ("RTP").

---

[1] This disposition is not designated for publication in the official reports.

According to former director and instructor Virginia Becchine ("Becchine"), the RTP is "a two-year Foothill College program which prepares students for employment in the high-tech health care field of respiratory care, and prepares them to take and pass the licensing examination required by California and the National Board for Respiratory Care's more advanced Registry Examination." (Becchine Decl. ¶ 3.) The RTP consists of both classroom work and a clinical component. (*Id.* ¶ 5.) Students in the RTP may be dismissed from the program if they receive a grade lower than "C" in a core respiratory course, an "F" in any required program course, or three "marginal evaluations." (*Id.* ¶ 3.) A marginal evaluation "is similar to a failing grade, and can arise from both failures of performance in the didactic (classroom), such as failing to achieve a passing grade, and behaviors in the clinical (hospital) sides of the RTP." (*Id.*)

After taking and passing the prerequisite courses, Ikekwere was admitted into the RTP for the fall quarter of 2004. In May 2006, Ikekwere received a marginal evaluation in RSPT 70D (Clinical Rotation), which is the last clinic students must complete before graduation from the RTP. (Becchine Decl. ¶ 17.) This was the third marginal evaluation Ikekwere had received in the program, the first two resulting from his twice having received a failing grade in the same course, RSPT 51C. (*Id.* ¶ 11.) At a meeting with Ikekwere and the instructor who supervised RSPT 70D, Professor Larry Miller ("Miller"), Becchine informed Ikekwere that he was being dismissed from the program. (*Id.* ¶ 18.)

Following his dismissal, Ikekwere unsuccessfully pursued a grievance with the school. Ikekwere also filed a complaint of discrimination with Defendant. A Determination Panel convened by Defendant to review the complaint found that the dismissal and other conduct of which Ikekwere complained were not the result of discrimination or retaliation. Ikekwere appealed the Panel's decision to the Chancellor of the California Community Colleges. That appeal was denied after an independent investigation.

On January 14, 2008, Ikekwere filed the initial complaint in this action. On December 18, 2008, Ikekwere filed the operative First Amended Complaint ("FAC") alleging discrimination based on his race, nationality, and disability in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, ("Title VI") and Section 504 of the Rehabilitation Act of

1973, 29 U.S.C. § 794, ("Section 504").[2] Ikekwere is an African-American of Nigerian national origin and alleges that he suffers from a disability within the meaning of the Rehabilitation Act. (FAC ¶¶ 1, 40.) Ikekwere claims that beginning in the spring of 2004, he was "subjected to a continuing pattern of unlawful discriminatory actions and conduct without cause or justification." (Ikekwere Decl. ¶ 4.)

**1.   Plagiarism Accusation**

According to Ikekwere, the first incident in this alleged pattern was a false accusation of plagiarism by one his professors, Dr. Carolyn Holcroft ("Holcroft"), in a class entitled Biology 41. (*Id.* at ¶5; FAC ¶ 7; Holcroft Decl. ¶ 2.) Holcroft believed that Ikekwere had engaged in a form of plagiarism by failing properly to attribute parts of a paper to the original author. (Holcroft Decl. ¶ 3.) After hearing from both Ikekwere and Holcroft, a campus body "determined that what Mr. Ikekwere had done was not plagiarism but instead was a result of his mis-understanding of the directions to be followed when preparing the paper." (*Id.* at ¶ 4.) Holcroft was Ikekwere's instructor in Biology 45 in the following quarter and did not follow his academic career following the conclusion of that class. (*Id.* at ¶ 5.) Holcroft never spoke to any members of the RTP faculty or administration regarding the plagiarism accusation. (*Id.*)

**2.   Application to the RTP**

Ikekwere further alleges that Dr. Shirley Barker ("Barker"), Dean of Biological Sciences at Foothill, told him she had not received his application to the RTP only to "discover" later first an incomplete version of the application and later the complete application itself. (FAC ¶¶ 9-12; Ikekwere Decl. ¶¶ 7-10.) Barker asserts that she first learned of Ikekwere's application in June 2004 when she received a call from Ikekwere concerning the status of the application. (Barker Decl. ¶ 5.) Barker states further that she found Ikekwere's application either the same day or the next day on the desk of Kerry West, the program administrator. (*Id.*) Finding the application

---

[2]In its motion, Defendant addresses allegations in the FAC of harassment and retaliation. However, in his response, Ikekwere does not counter any of Defendant's arguments as to those allegations and instead clarifies that he "has not explicitly alleged a cause of action for retaliation or harassment, and [sic] even though evidence in the record indicates a factual basis for such causes of action." (Pl.'s Opp'n 16.)

incomplete, Barker put Ikekwere on the "alternate" list and called him to tell him so. (*Id.*) She then sent him written notice that he had been accepted off the list. (*Id.*) Barker claims that she did not consider Ikekware's race, nationality, or disability in making her decisions regarding his application. (*Id.*)

In his declaration, Ikekwere claims that "Dr. Barker's story that my application was incomplete is not believable. I was <u>never</u> placed on the alternative list. She never advised me I was an alternate." (Ikekwere Decl. ¶ 68 (emphasis in original).)

### 3. Initial Meeting of the RTP Class of 2006

According to Ikekwere, Barker told him to leave an introductory RTP meeting on August 5, 2004, telling him that he had been admitted by mistake. (FAC ¶¶ 14-15; Ikekwere Decl. ¶¶ 12-13.) Ikekwere alleges that Barker told him to come back after the meeting, at which time she again told him there had been a mistake and that he would have to do his clinical work at night because there were no places remaining where he could do the work during the day. Barker claims that when she spoke to Ikekwere after the meeting she realized for the first time that she inadvertently had sent him a cover letter intended for those who had been selected to start the program rather than for those accepted as alternates. (Barker Decl. ¶ 6.) Barker had sent the proper alternate acceptance form, which Ikekwere had completed and returned. (Barker Decl. Ex. A.) Realizing her mistake, Barker apologized to Ikekwere and informed him that she would admit him as a regular admittee but that he would have to take his clinical classes at night. (Barker Decl. ¶ 6.) Although Ikekwere agreed to this arrangement, RTP staff later were able to find him a clinical placement during the day. (*Id.*) Barker asserts that her actions were not motivated by Ikekwere's race, nationality, or disability. (*Id.*)

### 4. Incidents During Clinical Work

Miller, who was the Director of Clinical Rotation and Ikekwere's clinical supervisor, asserts that Ikekwere "had some problems in the clinical rotation" element of the RTP. (Miller Decl. ¶ 4.) The first incident occurred at the Santa Clara Kaiser Permanente clinic in November 2005. According to Jason Villavert ("Villavert"), Ikekwere's "perceptor" or clinic instructor, Ikekwere yelled at him in the Intensive Care Unit in front of a patient and another student after

Villavert had corrected Ikekwere about touching non-sterile items with his gloves before performing a procedure on the patient. (*See* Shupe Decl. Ex. C (Villavert Depo.) at 20:7-28:10; see also Hon Decl. 2:13-25.) Miller asked Villavert to prepare a memo regarding the incident, which Villavert did. (Miller Decl. ¶ 4, Ex. A.) Miller did not use the incident as a basis for dismissing Ikekwere from the program or the clinic (Miller Decl. ¶ 4), nor was the incident used as the basis for a marginal evaluation. (*See* Becchine Decl. 14:20-25.)

At his deposition, Ikekwere acknowledged the incident and insisted that he brought the incident to Miller's attention via e-mail. (Ikekwere Depo. 134:6-8.) He also claimed that Miller requested that the hospital file an unsatisfactory and unsafe report against him, but that the hospital refused. (*Id.* at 134:9-25.) Ikekwere also disputes the reason for the exchange and the allegation that he yelled in front of the patient. He claims that the other student's account is "totally fabricated." (Ikekwere Decl. ¶ 93.)

The second clinical incident allegedly occurred at Santa Clara Valley Medical Center ("Valley Medical") in May 2006. According to Paul Barazza ("Barazza"), Ikekwere's perceptor at Valley Medical, he received reports from several hospital employees several days before May 12, 2006, that Ikekwere had engaged in unsafe behaviors while under their supervision. (Barazza Depo. 46:12-17; *see* Hovland Decl. 2:5-8 and Ex. A; Naik Decl. 2:5-8 and Ex. A; Dasari Decl. 2:5-8 and Ex. A.) Barazza reviewed the evaluations and spoke to the individual employees about Ikekwere's behavior. (Barazza Depo. 49:18-25.) Following these discussions, Barazza determined that Ikekwere should be dismissed from the clinic. (*Id.* at 49, 51.) Barazza informed Ikekwere of his decision on May 12, 2006, at a meeting that also was attended by Miller. (*Id.* at 51.) Barazza made the decision to dismiss Ikekwere without input from Miller. (*Id.*)

The FAC does not mention the May 2006 incident at Valley Medical, but it does allege that Miller "continued to issue false evaluations of [Ikekwere's] performance including [his] performance at Santa Clara Valley Medical Center, even though [he] performed excellently at Sequoia Hospital, El Camino Hospital, Stanford Hospital, Kaiser Hospital, and Good Samaritan Hospital, receiving final grades of A at said facilities." (FAC 17; Ikekwere Decl. ¶ 15.)

1  Specifically, the FAC alleges that Miller falsely reported in late April and early May that
2  Ikekwere was leaving work early without permission, failing and refusing to perform ventilator
3  patient assessments as directed, and failing to check a patient's endotracheal tube cuff pressure as
4  instructed. (FAC 18-19; Ikekwere Decl. ¶¶ 16-17.) These specific complaints were among those
5  that had been communicated to Miller by Barazza. (Miller Decl. ¶ 5.)

6      At his deposition, Ikekwere opined that the events that led to his dismissal from Valley
7  Medical were part of Miller's "plan with Paul Barazza to get this done." (Ikekwere Depo. 159.)
8  In his declaration, Ikekwere asserts that Miller and Barazza "fabricate[d] problems concerning
9  [his] performance." (Ikekwere Decl. ¶ 76.) He also claims that Miller "has on occasion
10 conspired and destroyed my excellent perceptor's evaluation at Santa Clara Valley Medical
11 Center and has placed in my file some evaluations I never received from perceptors like Latha
12 Dasari and Sree Naik from the same hospital." (Ikekwere Decl. ¶ 87.)

13     Ikekwere also recounts in great detail his shifts at Valley Medical and purports to relate
14 favorable scores from his evaluations by several perceptors, though he does not actually provide
15 the evaluations or indicate the sources of the information. (*See* Ikekwere Decl. ¶¶ 102-16.)
16 According to Ikekwere, he "had no problem whatsoever at Santa Clara Valley Medical Center
17 until Mr. Miller's visit on April 28. Ms. Naik did not evaluate my performance and Ms. Hovland
18 gave me the worst daily evaluation [he] ever received in all the hospitals [he] ever rotated in."
19 (Ikekwere Decl. ¶ 113.) With respect to the descriptions of unsafe conduct contained in
20 declarations of individual employees at Valley Medical, Ikekwere either describes them as false
21 statements or denies that the underlying events ever occurred. (Ikekwere Decl. ¶¶ 134-152.)

22     **5.   Urband's Refusal of Test Accommodation**

23     Ikekwere alleges that "while taking classes under Professor Rick Urband, Mr. Urband
24 refused my access to the Adaptive Learning Division, he singled me out for less favorable
25 treatment than he provided my fellow students." (FAC 20; Ikekwere Decl. ¶ 18.) The FAC
26 further alleges that personnel from several divisions complained to Becchine about Urband's
27 treatment of Ikekwere. (FAC 21; Ikekwere Decl. ¶ 19.)
28     Urband was the instructor in one of Ikekwere's classes in the spring of 2006, RSPT

60C–Pulmonary Function Testing. (Ikekwere Depo. 42:8-24; Urband Decl. ¶ 3.) Ikekwere and his classmates were scheduled to take the mid-term examination for the course on May 22, 2006. (Urband Decl. ¶ 3.) On May 8, 2006, Ikekwere informed Urband that he wanted to take the test at the Adaptive Learning Center. (*Id.*) Urband informed Ikekwere that he would need to bring Urband the appropriate paperwork. (*Id.*) Ikekwere was required to provide Urband with two documents, an Academic Accommodation Notification and a Test Accommodation Delivery Sheet. (Urband Decl. ¶ 2.) Although Urband received the Test Accommodation Delivery Sheet one week prior to the examination, he did not receive the Academic Accommodation Notification. (Urband Decl. ¶ 4.) Urband returned the Test Accommodation Delivery Sheet to the Adaptive Learning Center and informed the Center that Ikekwere's request to take the test at the center had been denied. (*Id.*) Urband claims that he did not tell Ikekwere about the denial until the day of the test because the class met only once each week. (*Id.*)

When Urband told Ikekwere that his request had been denied because Urband had not received both of the required documents, Ikekwere left the classroom and returned with both forms. (Urband Decl. ¶ 5.) Urband then authorized Ikekwere to take the test at the center, which Ikekwere did later that day. (*Id.*) Ikekwere received a passing grade of "C" on the exam. (*Id.*) At his deposition, Ikekwere indicated that the incident with Urband was the only situation in his RTP courses in which an instructor did not provide him with the accommodation that had been authorized by Foothill's disability program. (Ikekwere Dep. 60:5-15.) In his declaration, Ikekwere claims that he did everything he was told to receive the accommodation and that Urband "literally denied [him] an accommodation because he was not sure [Ikekwere] was disabled." (Ikekwere Decl. ¶ 33.)

**6.     Urband's Alleged Discriminatory Statements**

Ikekwere alleges that Urband called him into his office on May 26, 2006, shortly after the midterm incident, and said, "boy, how old are you?" (FAC ¶ 22; Ikekwere Decl. ¶ 20.) He alleges that he felt so insulted that he walked out of the office. (*Id.*) Urband denies ever referring to Ikekwere as "boy." (Urband Decl. ¶ 7.)

Ikekwere further alleges that on another occasion in May 2006, Urband pointed his finger

7

Case No. C-08-00234-JF (PVT)
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
(JFLC3)

1  in his face and said, "you must see [Becchine] or you face severe consequences" after Ikekwere
2  had told Urband that he could not meet with Becchine directly after class because of a medical
3  appointment. (FAC ¶ 23; Ikekwere Decl. ¶ 21.) According to Urband, the exchange occurred on
4  June 28, 2006. (Urband Decl. ¶ 8.) Urband asserts that he told Ikekwere that it would be in his
5  best interest to make time to meet with Becchine, that he repeated the statement, and that he did
6  not threaten Ikekwere in any way. (*Id.*) He indicated that it was not his intent to be rude to
7  Ikekwere. (*Id.*) At his deposition, Ikekwere confirmed that Urband's two remarks were the only
8  two times anyone at Foothill said something he interpreted as being related to his race or
9  nationality. (Ikekwere Depo 255:16-256:5.)

**7. Alleged False Grading by Becchine**

Ikekwere alleges that Becchine, who also served as one of his instructors, "continued to falsely downgrade his scores on test and examinations [and] falsely reported that Plaintiff failed to score passing grades [in] RSPT 51 C and that Plaintiff failed to pass his final examinations." (FAC ¶ 24; Ikekwere Decl. ¶ 22.) According to Becchine, Ikekwere received a "D" in RSPT 51C the first time he took the final examination, in June 2005. (Becchine Decl. ¶ 10.) As a result, Ikekwere received his first marginal  marginal evaluation in July 2005. (*Id.*; Ex. B.) Becchine informed Ikekwere that in order to remain in the program he could either retake the exam or retake the class the following spring. After discussing his options with Becchine, Ikekwere reviewed and signed the written marginal evaluation, which advised him that in order to stay in the program he needed to "(a) take and pass RSPT 61A, Adult Mechanical Ventilation, during the summer quarter; and (b) retake and pass a comprehensive final examination fro RSPT 51C with a high enough grade to achieve a passing course grade. Mr. Ikekwere's other quiz and test scores in RSPT 51C had been so low that he needed to achieve a 75% or better score on the comprehensive final exam to achieve a passing course grade." (Becchine Decl. ¶ 10; Ex. B.) Becchine claims that at no point during the conversations regarding Ikekwere's options did Ikekwere dispute his first 51C final exam score, course score, or the required 75% score. (Becchine Decl. ¶ 10.)

On October 7, 2005, Ikekwere retook the RSPT 51C final exam and again received a "D"

8

grade, scoring only 63%. (*Id.* Ex. C.) Becchine met with Ikekwere and showed him his "scantron" results. According to Becchine, at no point did Ikekwere state or suggest that she had mis-scored the results. (Becchine Decl. ¶ 10.) As a result of the second score, Becchine issued a second marginal evaluation notification, and also indicated in the notification that Ikekwere would be given a third opportunity to score higher on the test. (*Id.*) If he failed the third time, Ikekwere's options were either to drop out of the program or retake the entire 51 C course. (*Id.*)

On November 28, 2005, Ikekwere took the test for the third time and again failed to achieve a passing score, this time receiving a score of 62%. (*Id.*) At this point, Becchine could have issued Ikekwere a third marginal evaluation, but she refrained from doing so. Instead, she emailed him to inform him that he could either retake the course in the spring or drop out of the program. (*Id.*) She also offered to meet with him to review his test results. (*Id.*) Becchine states that the second two tests were not harder than the original. (*Id.*) She indicates that some questions were identical and that many of the questions on the make-up tests came from the test banks of the books used in the course. (*Id.*)

Ikekwere claims that Becchine failed him on his first exam in RSPT 51C, "but when [he] asked her to review [his] scantron (computerized answer sheet) she claimed she had 'lost' it." (Ikekwere Decl. ¶ 29.) He further claims that she "lost" his scantron for RSPT 62 and failed him in that course as well. (Ikekwere Decl. ¶ 30.) He asserts that his scantron was the only one lost (though he doesn't specify to which exam this applies). (Ikekwere Decl. ¶ 32.) Ikekwere claims that Becchine "lost" three of his scantrons. He asserts that one of them subsequently was discovered and that Becchine intentionally had marked correct answers as incorrect. After he "made her correct it," he claims that he actually passed the exam and received a "C" grade. (Ikekwere Decl. ¶¶ 39-40.) Ikekwere also alleges that Becchine intentionally destroyed his scantrons and falsely claimeed that he failed RSPT 51C. (Ikekwere Decl. ¶ 50.) Finally, Ikekwere maintains that he signed the "so-called education contract" under compulsion by Becchine through "undue pressure, threats and harassment from her." (Ikekwere Decl. ¶ 7.) He denies that he received a D in RSPT 51 C, and he asserts that Becchine forced him to take the test rather than repeat the course even though he had just returned from Nigeria and was taking a

9

1  full load of classes.  (Ikekwere Decl. ¶¶ 41-42.)

### 8. Alleged Further Discriminatory Actions by Becchine

Ikekwere claims that Becchine told one of his fellow students to spy on him, but that Becchine denied doing so when he confronted her about it. (Ikekwere Decl. ¶ 38.)  Ikekwere describes an exchange during one of Becchine's classes in March 2006 in which he says Becchine "rudely yelled at [him] to shut up" as he was trying to note answers on a separate piece of paper because he did not have his "lost" scantron.  (Ikekwere Decl. ¶ 39.)

### 9. Alleged Discriminatory Dismissal from the Program

Ikekeware was dismissed from the program on May 16, 2006, after he received his third marginal evaluation as a result of his dismissal from Valley Medical clinic by Barazza for unsafe behavior.  Miller, Becchine, and Barazza all assert that Ikekwere's race, nationality, and disability played no role in the decision to dismiss him from the program.

## II. LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of informing the Court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets this initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  A genuine issue for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. *Anderson*, 477 U.S. 242, 248-49; *Barlow v. Ground*, 943 F.2d 1132, 1134-36 (9th Cir. 1991).

### III. DISCUSSION

**A.     Prima Facie Case of Discrimination**

Ikekwere's claims require him to prove discrimination based on his race, nationality, or disability under either Title VI or Section 504. (*See* Pl.'s Opp'n 10.) The parties agree that the elements of a prima facie case of discrimination are the same under the two statutes. *See Smith v. Barton*, 914 F.2d 1330, 1340 (9th Cir. 2001). In the education context, those elements are: "membership in a protected class, meeting the school's legitimate educational expectations, an adverse educational action and worse treatment than that of similarly situated students not in the protected class." *Brewer v. Bd. of Trustees, Univ. Ill.*, 479 F.3d 908, 921 (7th Cir. 2007), *cert. denied* 128 S. Ct. 357 (2007).

**1.     Race or National-Origin Based Discrimination**

Ikekwere argues that he has "clearly established" a prima facie case for his race and national-origin based discrimination claims.[3] (Pl.'s Opp'n 11.) First, he contends that he is a member of a protected class because he is an African-American man of Nigerian national origin. Second, he cites his own declaration as evidence that he was subjected to a "multitude of adverse actions" as a student at Foothill. (Pl.'s Opp'n 11.) Ikekwere lists twenty-three such actions, ranging from the false plagiarism accusation by Holcroft to "[f]alse negative performance evaluations" by Valley Medical employees and finally to his dismissal from the RTP. (Pl.'s Opp'n 11-12.) Ikekwere also states, without any support in the record, that "his non black fellow students were not subjected" to the "multitude of adverse actions" to which he was subjected. (Pl.'s Opp'n 11.)

Defendant concedes that there is evidence in the record that Ikekwere is a member of a protected class and that he suffered adverse educational actions, but it argues that there is no evidence that Ikekwere met Foothill's legitimate educational expectations or that Ikekwere was treated differently from any similarly situated non-protected student.

---

[3] Though he separates the arguments in his opposition brief, Ikekwere fully incorporates his argument under Title VI into his argument under Section 504 without making any new arguments. (*See* Pl.'s Opp'n 15.)

1  With respect to educational expectations, Defendant argues that the record evidence
2  shows that Ikekwere failed to meet both the academic and clinical standards of the program.
3  With respect to his failing grades in RSPT 51C, Defendant points out that Ikekwere accuses
4  Becchine of intentionally fabricating his grades without identifying any supporting evidence.
5  While two of the three scantron forms from Plaintiff's examinationss are in evidence, Defendant
6  argues that the inferences necessary to support Ikekwere's theory are unreasonable and
7  unsupported by any other evidence.  Similarly, with respect to Ikekwere's clinical performance,
8  Ikekwere describes all of the medical professionals at Valley Medical who were critical him as
9  liars and conspirators.  The only "evidence" identified by Ikekwere in his declaration are his own
10 subjective evaluations of his performance at Valley Medical and in other clinical rotations.

11  Defendant also contends that Ikekwere has provided no admissible evidence that any
12 similarly situated non-African American student was treated more favorably than he was.
13 Ikekwere's declaration does identify a Caucasian student named Gary Shade. (Ikekwere Decl. ¶
14 126.)  According to Ikekwere, Shade received a series of unsafe or unsatisfactory evaluations at
15 El Camino Hospital in 2004.  (*Id.*)  Defendant objects to this reference, arguing that Ikekwere's
16 summary of Shade's confidential academic information is "utter speculation and completely
17 inadmissible in this proceeding." (Def.'s Reply 7.)  Responding to Defendant's objection,
18 Ikekwere asserts that the paragraph "simply stated information that was common knowledge to
19 the students in his class who always shared information about their grades and evaluations in the
20 program." (Pl.'s Resp. to Def.'s Obj. to Evid. 19.)  Rumors and hearsay clearly are insufficient
21 to establish the personal knowledge necessary for the admission of Ikekwere's representations
22 with respect to Shade's evaluations.

23  Becchine did state in her declaration that Shade was issued a marginal evaluation for
24 unsafe behavior at a clinic position and subsequently issued a second marginal evaluation for
25 failing the corresponding clinic course. (Becchine Decl. ¶ 11.)  However, Becchine also stated
26 that Shade repeated the course–as Ikekwere was given the opportunity to do with his failed
27 course–and passed. (*Id.* at 10:2-12.)  Unlike Ikekwere, Shade did not receive a third marginal
28 evaluation requiring dismissal under the program's established rules.  Defendant argues that

1  Shade and Ikekwere thus were not similarly situated.

2  The Court concludes that Ikekwere has failed to meet his burden of establishing a prima facie case of discrimination based on his nationality and race.  At most, his declaration establishes that he is a member of a protected class and that he suffered adverse educational outcomes.  Without actual evidence of a linkage between the two, this is not enough.

### 2. Disability-based Discrimination

Ikekwere also contends that he has established a prima facie case of discrimination on account of his disability.  Specifically, Ikekwere argues that despite the fact that Urband's denial of the testing accommodation was temporary, "initially, Mr. Urband denied Ikekwere access to the midterm exam in pulmonary function, even though he had supplied him with all necessary documentation therefor, insisting that Plaintiff provide him with further medical evidence, without requiring same of other students." (Pl.'s Opp'n 14.)  Ikekwere claims that Urband's actions "were completely unwarranted and although temporary, did disrupt Plaintiff's preparation for said exam, making it more stressful and clearly were evidentiary of discriminatory animus, coinciding with [the alleged discriminatory actions described in the section regarding race discrimination]." (*Id.* at 14-15.)

Defendant argues that Ikekwere has failed to introduce admissible evidence showing either that he met Foothill's legitimate educational standards or that a similarly situated non-disabled student was treated more favorably than he.  Ikekwere failed to address either of these elements in his opposition.  Defendant also argues that the complaint appears to allege a failure to accommodate claim under Section 504.  This is not clear, as Ikekwere appears to frame his discrimination claim solely in terms of a failure to provide the test accommodation. Defendant contends that such a claim, if made, should fail as a matter of law because Urband's motivation was compliance with the rule requiring both accommodation forms, not discrimination; the denial was temporary and corrected the same day; the denial did not affect Ikekwere's grade in the class, which he passed; and there is no evidence of any other denial.

Ikekwere addresses his disability claim only in passing and points to no evidence that Urband initially denied him his accommodation because he was disabled rather than because he

13

did not have both of the required forms. Indeed, when Ikekwere returned with both forms, he was allowed the accommodation.

**B.     Lawful Justification**

Even if Ikekwere were able to establish a prima facie case of discrimination, Defendant argues that it has met its burden of providing a lawful justification for its actions through the explanations in the record of all the alleged bad actors. Defendant contends that Ikekwere must show that the explanations offered are pretextual, which he has failed to do.

Ikekwere has provided no admissible evidence from which to conclude that Defendant's actions were taken for discriminatory reasons. Ikekwere has called many of the individuals who failed him in classes and gave him negative evaluations liars, but he has offered no evidence beyond his own subjective beliefs tending to show why these individuals lied or falsely evaluated him. The only evidence in the record that indicates any type of discriminatory animus is Ikekwere's version of his conversation with Urband that included the "boy" comment. Given its long cultural history, the use of "boy" certainly is highly suggestive of bias. However, even assuming the comment was made, the record contains no evidence that Urband was a decision-maker or had any impact on any of the adverse educational consequences Ikekwere allegedly suffered.

### IV. ORDER

Good cause therefor appearing, Defendant's motion is GRANTED.[4] The Clerk shall enter judgment and close the file.

DATED: 5/13/10

_____
JEREMY FOGEL
United States District Judge

---

[4] On April 23, 2010, Defendant filed objections to many statements in Ikekwere's declaration. Because Defendant's motion will be granted, to the extent the individual objections are not addressed in this order, they are overruled as moot.

14

Case No. C-08-00234-JF (PVT)
ORDER GRANTING MOTION FOR SUMMARY JUDGMENT
(JFLC3)